1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
9                                      AT TACOMA
10
11    TAMBLE TAYLOR,                              CASE NO. 18-cv-5622-RJB

                              Plaintiff,         ORDER GRANTING
12            v.                                 DEFENDANT'S MOTION FOR
                                                 SUMMARY JUDGMENT
13    LOWE'S CORPORATION, a North
      Carolina corporation, doing business in
14    Washington,

15                            Defendant.

16
           THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment.
17
      Dkt. 34. The Court is familiar with the motion, materials filed in support and opposition thereto,
18
      and the remainder of the record herein. For the reasons set forth below, Defendant's Motion for
19
      Summary Judgment should be granted.
20
                                     I.       FACTS
21
      1.  FACTUAL BACKGROUND
22
           This is a race and age discrimination and wrongful termination case. Dkt. 1. Plaintiff is an
23
      "African American male" and was 59 years-old at the time his employment with Defendant was
24

terminated. Dkt. 1, at 3. Plaintiff worked for Defendant from January 28, 2007, until he was terminated on April 14, 2016. Dkt. 36-1. Plaintiff was a Hardware/Tools Department Manager at the time of termination. Dkt. 36-1, at 12-15.

Plaintiff's Complaint and Supplemental Response are disorganized and confusing. *See* Dkts. 1; and 47. The Complaint enumerates two claims: (1) race and age discrimination and (2) wrongful termination in violation of public policy. Dkt. 1, at 3-4. However, Plaintiff cites multiple causes of action with respect to the two claims. *See* Dkt. 1, at 3–4. Giving the Plaintiff the benefit of any doubt, it appears that Plaintiff's Complaint contains the following five claims: (1) race discrimination under Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e *et seq*. ("Title VII"); (2) race discrimination under the Washington Law Against Discrimination, RCW 49.60 *et seq*. ("WLAD"); (3) age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA"); (4) age discrimination under the WLAD; and (5) Wrongful Discharge in Violation of Public Policy ("WDVPP"). *See* Dkt. 1, at 3-4; *see also* Dkt. 47, at 8.[1] Additionally, the Parties dispute whether the Complaint includes a retaliation claim. *E.g.,* Dkts. 52, at 2:13–14; and 60, at 9.

a. Defendant's Workplace Policies

Defendant has adopted an Equal Employment Opportunity Policy. Dkt. 35-1. "Lowe's is an equal opportunity employer and administers all personnel practices without regard to race, color, religion, sex, age, national origin, disability, sexual orientation, gender identity or

---

[1] Plaintiff asserts in his Supplemental Response that his six (misnumbered) claims are as follows:

> (1) Violation of the Civil Rights Act of 1964, codified in 42 U,.S.C. [*sic*] 2000e et. seq., (2) Civil Rights Act of 1981, equal opportunity; (3) (Disparate Treatment) Discrimination based on age; (4) State law tort for Wrongful termination in violation of public policy; (5) Discrimination in violation of RCW 49.60; and (5) [*sic*] Retaliation.

Dkt. 47, at 8.

expression, marital status, veteran status, genetics or any other category protected under applicable law." Dkt. 35-1, at 1.

Defendant implements employee discipline according to its Correction Action Procedure. Dkt. 35-4. Employee violations are categorized as Class A, B, and C. Dkt. 35-4. "Class A infractions are the most serious and … can result in termination without any prior discipline." Dkt. 35, at 2; Dkt. 35-4, at 3. For Class B violations (intermediate seriousness), an employee may receive a written warning, a final warning, and then termination. Dkt. 35-4, at 3. For Class C violations (less serious), an employee may receive initial, written, and final warnings; a fourth violation within a 12-month period will result in termination. Dkt. 35-4, at 3.

Defendant has a Recovery without Detention ("RWD") policy with respect to deterring shoplifters. Dkt. 35-5. According to the RWD policy, if suspected shoplifters are observed attempting to take visible merchandise without paying for it, employees may "greet, offer, and validate" ("GOV") the customer by asking to ring up the merchandise and/or check their receipt. Dkt. 35-5. The policy provides, in part:

> If the customer refuses to comply with the <u>GOV</u> request, do not attempt to detain, block, or make any physical contact with the customer. Never pursue the customer out of the store into the parking lot. These guidelines must be followed for the protection of Lowe's associates and our customers …. **Note:** Only certified <u>LPS/LPM</u> [(Loss Prevention Specialist/Manager)] are allowed to make a detention.

Dkt. 35-5 (emphasis in original).

"Attempting to detain, block or make physical contact with a customer by non LPS/LPM employees (e.g., pursuing a suspected shoplifter out of the store)" is a Class A Violation. Dkt. 35-4, at 7.

1

b. <u>Shoplifting Incident</u>

2    Plaintiff was terminated following a shoplifting incident that occurred on April 3, 2016.

3  The Parties dispute whether Plaintiff's conduct during the shoplifting incident complied with

4  Defendant's RWD and GOV policies.

5    Plaintiff contends that Jake Eisen ("Mr. Eisen"), a store manager, observed a

6  "suspicious" African-American customer entering the Lowe's store where Plaintiff worked. Dkt.

7  47, at 4. Mr. Eisen called Plaintiff off his break to "GOV the African American customer." Dkt.

8  47, at 4. The customer attempted to walk out of the store with a product. Dkt. 36-5, at 8.

9    Plaintiff alleges that he "followed the RWD policy and greeted, offered assistance and

10  validated the product by asking the customer to let him demagnetize the product. The customer

11  jerked away knocked the pen out of Mr. Taylor's hand and said No bro., I got it and walked out

12  the door." Dkt. 47, at 4-5. Plaintiff further alleges that "Mr. Eisen perused [*sic*] the shoplifter out

13  of the store in violation of RWD policy. After Mr. Eisen returned he told Mr. Taylor that 'you

14  did nothing wrong.' He also told Mr. Taylor that 'he is on his final.'" Dkt. 47, at 5.

15    Apparently, there is security video footage with no audio of the shoplifting incident. *E.g.,*

16  Dkts. 35-19 (providing still images from the video); 36-5, at 3; and 48-2, at 14. Mr. Eisen's

17  deposition testimony indicates that he did not initially believe Plaintiff violated the GOV policy,

18  but "after reviewing the video, it didn't look very good." Dkt. 48-2, at 14. Mr. Eisen indicates

19  that, on the video, it looks like Plaintiff "crossed the line by grabbing the package." Dkt. 48-2, at

20  14. Plaintiff contends that the video footage, lacking audio, inaccurately depicts the shoplifting

21  incident. *E.g.,* Dkt. 35-17, at 1 ("The audio would have verified what I tried to do.").

22

23

24

Defendant investigated the shoplifting incident. Dkt. 47, at 5. Jonathan Graham ("Mr. Graham"), a Regional Loss Prevention Manager for Defendant, watched the video footage and described it as follows:

> [The video] shows an individual carrying a – I believe a DeWalt tool. He was headed towards the lumber exit. You see Tamble walking with the individual from – you know, maybe one or two steps back from him.
>
> Then you see the individual pass the registers area, and then you see Tamble Taylor close the distance and come up from behind and reach over, from my perspective, the – I guess it would be the right shoulder of the individual and, it would appear, grab the product out of the individual's hands.
>
>                    ….
>
> It looked like he was going for the product, to take control of the product, to not allow it to leave.

Dkt. 36-5, at 8–9, 11.

Mr. Graham opined that Plaintiff's actions created a dangerous situation in the store and determined that the issue needed to be addressed. Dkt. 36-5, at 9–12. Mr. Graham turned his findings over to Amy Sutherland ("Ms. Sutherland), a Human Resources employee for Defendant. Dkt. 36-5, at 3.

Ms. Sutherland wrote a declaration providing as follows:

> 5. I determined that Mr. Taylor violated Lowe's GOV Policy and, as a result, made the recommendation to terminate his employment. In making that determination, I reviewed the security camera footage provided by Loss Prevention regarding the shoplifting incident on April 3, 2016. I reviewed two videos. The videos were compelling evidence and strongly supported the fact that Mr. Taylor violated Lowe's GOV Policy by grabbing merchandise from the shoplifter which led directly to a physical scuffle. I also reviewed statements from several employees about the shoplifting incident, including Jake Eisen[2] and Mr. Taylor. I

---

[2] Mr. Eisen had written an email to Ms. Sutherland stating that:

found the security camera footage to be a more accurate and credible depiction of the shoplifting incident than the statements.

6. In assessing the appropriate discipline for Mr. Taylor, I considered the fact that he was already on a "final" disciplinary warning at the time of the GOV policy violation in April 2016. Under Lowe's policy, a GOV Policy violation is a Class A infraction. Class A infractions are the most serious and, in my experience, can result in termination without any prior discipline. In this instance, however, Plaintiff was already at the end of a significant disciplinary track record.

7. As I did for Plaintiff, I recommended termination for the Lacey Store Manager, Mark Mills, earlier the same week as Plaintiff for violating Lowe's GOV Policy. Mr. Mills was not on any prior discipline and does not identify as black/African American.

Dkt. 35, at 2–3.

Ms. Sutherland further states that she reviewed the GOV termination history of two stores in her district with "the most substantial shoplifting activity from 2016 and 2017." Dkt. 35, at 3. Ms. Sutherland provides that her review showed seven employee terminations across different races and ages. Dkt. 35, at 3. Ms. Sutherland provides that, "I strive to be consistent in the application of discipline for similar infractions and similar situations, and believe that I did so here regardless of Plaintiff's race or age." Dkt. 35, at 3.

Following the shoplifting incident, on April 14, 2016, Plaintiff received an Employee Corrective Action Report ("ECAR") terminating his employment with Defendant. Dkt. 35-17.

---

Tamble wasn't aggressive in any way towards the customer from my perspective. I have reviewed the video and it doesn't look like what I have described as Tamble not being aggressive. But if you were there and watch it again he didn't try to continue to take the product. He didn't chase after the customer. He was just "customer serviceing" the customer by trying to deactivate the turtle that was on the product.

Dkt. 35-22.

Ms. Sutherland's HR investigative partner, Jonathan Graham, wrote that Mr. Eisen's email "sounds hokey we still don't grab for product." Dkt. 35-22.

The ECAR indicates that Plaintiff had received three disciplinary warnings within the prior 12 months: (1) an initial warning on September 8, 2015, for attendance, (2) a written warning for poor job performance on November 30, 2015, and (3) a final warning on March 6, 2016,[3] for attendance. Dkt. 35-17.

The ECAR notes that Plaintiff "did not properly Greet, and Offer to Validate when someone was exiting the store …. As a result of your actions, your employment with Lowe's Home Centers is hereby terminated effectively immediately." Dkt. 35-17. In the Employee Comments section of the ECAR, Plaintiff wrote, "I followed the guides I was given and tried to save company property without stopping or hurting the customer. I stand by what I did because it was within the guidelines." Dkt. 35-17.

On July 29, 2016, Plaintiff filed an employment age and race discrimination claim with the Washington State Human Rights Commission ("WSHRC") Dkt. 48-7. On June 21, 2018, the WSHRC dismissed Plaintiff's complaint, indicating that it "ha[d] adopted the findings of the state or local fair employment practices agency that investigated this charge." Dkt. 48-7, at 7. The WSHRC dismissal also provided Plaintiff's notice of right to sue. Dkt. 48-7, at 7.

    c.  <u>Plaintiff's Work Performance</u>

The Parties disagree as to the character of Plaintiff's work performance. Plaintiff contends that "Mr. Taylor had satisfactory job performance." Dkt. 47, at 2. Plaintiff provides various performance evaluations and other materials in support of this contention. Dkts. 47, at 4; and 48. Plaintiff's 2013 Performance Management Plan ("PMP") indicates that his final rating was a "Solid Performance" and that he was meeting his goals. Dkt. 48-1, at 8. Plaintiff's 2014

---

[3] The ECAR provides that the final warning was issued on "3/6/2015," but based on the sequencing of the warnings it appears this is typographical error and that the final warning was issued on March 6, 2016. *See* Dkt. 35-17; *see also* Dkt. 34, at 14 ("On March 6, 2016, Plaintiff received a 'final' disciplinary warning due to his ongoing attendance problems.").

and 2015 PMPs awarded him a final rating of "Inconsistent Performance." Dkt. 48-1, at 13, 26. Plaintiff points out that, notwithstanding the Inconsistent Performance rating, his manager commented to him in his 2016 PMP, "You have a lot to offer our store. Thanks for a great year." Dkt. 48-1, at 27.

Defendant contends that:

> Plaintiff struggled with performance issues for years before his termination. These issues were consistent across his roles at Lowe's and independently assessed by at least four different managers. Plaintiff's annual performance evaluations are riddled with areas that require improvement and Lowe's has issued disciplinary warnings to Plaintiff since at least 2009.

Dkt. 34, at 11.

Defendant provides various performance evaluations and other documents in support of Plaintiff's alleged performance issues. *E.g.,* Dkt. 35-8 (a performance evaluation rating Plaintiff a 2 (partially achieving expectations) on a scale of 1 (not acceptable) to 5 (exceptional) and stating that Plaintiff's "overall sales are always in the bottom of the district").

Defendant also provides prior disciplinary warnings given to Plaintiff. Dkts. 34; and 35. On July 26, 2009, Plaintiff was issued a Class C "Poor Job Performance" disciplinary warning for failing to meet sales goals. Dkt. 35-7. On April 16, 2013, Plaintiff was issued a Class B "[u]nproductive behavior, inefficiency and/or negligence in the performance of assigned duties" disciplinary warning for not completing "cycle counts." Dkt. 35-10. Ms. Sutherland explains that "[o]ne of the key responsibilities for Department Managers includes completing Cycle Counts, which are an inventory mechanism that ensures Lowe's has an accurate tally of merchandise in stock and for sale." Dkt. 35, at 2.

d.  <u>Delivery Manager Position</u>

Plaintiff alleges that, in July 2015, Defendant had an open position for a Delivery Manager. Dkt. 47, at 3. Plaintiff contends that Defendant did not afford him an opportunity to interview for the position consistent with Defendant's Equal Opportunity Policy. Dkt. 47, at 3. Plaintiff claims to have asked a human resources manager why he was not given an opportunity to interview for the position but was not given an answer. Dkt. 47, at 3. Plaintiff claims he "did not follow up because he did not want to rock the boat because he feared that he would be harassed." Dkt. 47, at 3. Plaintiff argues that "Lowes [*sic*] harassed Taylor anyway by filing 3 unsupported corrective action notices over the next 7 months to get Taylor on his final so Lowes [*sic*] could finally fire Taylor." Dkt. 47, at 15.

## 2.  **PROCEDURAL HISTORY**

On January 23, 2020, Defendant filed the instant Motion for Summary Judgment, originally noted for consideration on February 14, 2020. Dkt. 34. On February 11, 2020, Plaintiff untimely (one day late) filed a response brief in opposition to Defendant's Motion for Summary Judgment. Dkt. 37. On February 14, 2020, Defendant filed a reply brief in support of its Motion for Summary Judgment. Dkt. 41.

On February 19, 2020, Plaintiff filed a Motion for Relief from a Deadline (Dkt. 44) requesting permission "to file an additional supplemental brief to organize and correct Plaintiff' [*sic*] [response] brief." Dkt. 44-1, at 3. The Court granted Plaintiff's Motion for Relief from a Deadline. Dkt. 55. Plaintiff filed an overlength "Supplemental [*sic*] Response" ("Supplemental Response") (Dkt. 47), which is Plaintiff's operative response brief filed in opposition to the instant Motion for Summary Judgment. Dkt. 55.

1    The Court granted Defendant leave to file a supplemental reply in support of the instant

2    Motion for Summary Judgment, due March 13, 2020. Dkt. 55. On March 13, 2020, Defendant

3    filed a Supplemental Reply. Dkt. 60.

4    On February 27, 2020, Plaintiff filed a Motion to Amend Complaint (Dkt. 52). On March

5    17, 2020, the Court denied Plaintiff's Motion to Amend Complaint because of undue delay and

6    undue prejudice. Dkt. 64. The originally filed Complaint (Dkt. 1) is the operative complaint.

7    **3.  ORGANIZATION OF THE OPINION**

8    Below, the Court discusses: First, the standard for summary judgment. Second, the

9    application of Washington state law. Third, Plaintiff's time-barred claims. Fourth, Plaintiff's

10   unpled retaliation claim. Fifth, Plaintiff's race discrimination claims. Sixth, Plaintiff's age

11   discrimination claims. Finally, Plaintiff's WDVPP claim.

12   **II.    DISCUSSION**

13   **1.  SUMMARY JUDGMENT STANDARD**

14   Summary judgment is proper only if the pleadings, the discovery and disclosure materials

15   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

16   movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

17   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

18   showing on an essential element of a claim in the case on which the nonmoving party has the

19   burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of

20   fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

21   the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

22   (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

23   metaphysical doubt."). *See also* Fed. R. Civ. P. 56(d). Conversely, a genuine dispute over a

24

material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

## 2. WASHINGTON STATE SUBSTANTIVE LAW APPLIES

Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), on state law claims, federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

## 3. PLAINTIFF'S TIME-BARRED CLAIMS

a. <u>Plaintiff's Title VII and ADEA Claims Related to the Delivery Manager Position</u>

Exhaustion of administrative remedies is a prerequisite to suit for claims under Title VII and the ADEA. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108–09 (2002); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994).

1     A plaintiff must timely file charges with the appropriate state agency and thereby afford

2 the agency an opportunity to investigate the charge. 42 U.S.C. § 2000e–5(b). Generally, a charge

3 must be filed within 180 days "after the alleged unlawful employment practice occurred." 42

4 U.S.C. § 2000e–5(e)(1). If a plaintiff files a charge with a state or local agency "with authority to

5 grant or seek relief from such practice," the period of limitations for filing a charge with the

6 agency is extended to 300 days. *Id.* Discrete acts of alleged discrimination are counted from the

7 date of occurrence. *Morgan*, 536 U.S. at 108–09. "Each discrete discriminatory act starts a new

8 clock for filing charges alleging that act." *Id.* at 113 (emphasis added).

9     In Plaintiff's WSHRC complaint, he claims that he was aggrieved by Defendant related

10 to the Delivery Manager position in August 2015. *See* Dkt. 48-7, at 5. In his Supplemental

11 Response, Plaintiff writes that his "lost opportunity occurred in July 2015." Dkt. 47, at 13.

12 Regardless, Plaintiff did not file with the WSHRC until August 8, 2016—exceeding the 300-day

13 period of limitations. Dkt. 48-7. Therefore, with respect to Plaintiff's 2015 Delivery Manager

14 claims, he did not timely file charges with the WSHRC and did not exhaust his administrative

15 remedies for claims under Title VII and the ADEA. *See* 42 U.S.C. § 2000e–5(e)(1).

16     b.  Plaintiff's WLAD Claims Related to the Delivery Manager Position

17     The statute of limitations for claims under the WLAD is three years. RCW 4.16.080(2);

18 *see also Demmings v. Pac. Mar. Ass'n*, 646 F. App'x 508, 508–09 (9th Cir. 2016) (citing *Cox v.*

19 *Oasis Physical Therapy, PLLC,* 153 Wn. App. 176, 196 (2009) (dismissing WLAD retaliation

20 and wrongful discharge claims as untimely). The court in *Cox* explained that WLAD

21 "[d]iscrimination claims must be brought within three years under the general three-year statute

22 of limitations for personal injury actions." *Cox,* 153 Wn. App. At 195. "[W]here a discrete act of

23 discrimination is alleged, the limitations period runs from the act." *Id.*

24

At deposition, Plaintiff alleges to have sought the Delivery Manager position between early 2015 and June 2015. Dkt. 36-1, at 24. On his complaint with the WSHRC, Plaintiff indicates that he was aggrieved by Defendant with respect to the Delivery Manager position in "August 2015." Dkt. 48-7, at 5. Plaintiff's Supplemental Response clarifies when he was allegedly overlooked for the Delivery Manager position: "Mr. Taylor's lost opportunity occurred in July 2015." Dkt. 47, at 13; *see also* Dkts. 34, at 20–21, 23 (Defendant repeatedly states that Plaintiff applied for the position on July 10, 2015, at the latest).

Plaintiff's Supplemental Response requests that his claims related to the Delivery Manager position be equitably tolled. *See* Dkt. 47, at 13-14. However, Plaintiff's only citations to authority for equitable tolling are a Southern District of Ohio decision and a Supreme Court of Nevada decision, neither of which are at all applicable here. *See* Dkt. 47, at 14. Moreover, Plaintiff does not indicate why he could not have filed this case between the date of his WSHRC notice of right to sue (June 21, 2018) and the end of the three-year statute of limitations (apparently on or about July 10, 2018). *See* Dkt. 47. Plaintiff has not adequately briefed or supported his request for equitable tolling.

Plaintiff's three-year limitations period began to run in June 2015, which is more than three years from this case's filing date of August 3, 2018. Plaintiff's WLAD claims related to the 2015 Delivery Manager position are time-barred and should be dismissed. *See* RCW 4.16.080(2); *Cox,* 153 Wn. App. at 195; *Demmings,* 646 F. App'x at 508–09.

Therefore, Plaintiff's Title VII, ADEA, and WLAD claims related to the 2015 Delivery Manager position should be dismissed as untimely and time-barred. Although Defendant argues that these claims also fail on the merits, the Court need not consider that at this time.

## 4.   RETALIATION CLAIM

The parties dispute whether Plaintiff's Complaint includes a retaliation claim. *E.g.,* Dkts. 52, at 2:13–14; and 60, at 9. A retaliation claim appears nowhere in the Complaint. *See* Dkt. 1; *see also* Dkt. 52, at 2 (Plaintiff acknowledging that there is "some confusion regarding the claim for retaliation"). Moreover, Plaintiff did not check the "Retaliation" allegation box on his complaint with the WSHRC and did not allege retaliation with the WSHRC. *See* Dkt. 48-7, at 2. Even if Plaintiff had pled a retaliation claim, he has not exhausted his administrative remedies with respect to that claim. *See Morgan*, 536 U.S. at 108–09.

Therefore, Plaintiff has not properly pled or brought a retaliation claim before the Court.

## 5.   RACE DISCRIMINATION CLAIMS

The proper legal framework for deciding Plaintiff's Title VII race discrimination claim is the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Aragon v. Republic Silver State Disposal Inc.,* 292 F.3d 654, 658 (9th Cir. 2002), *as amended* (July 18, 2002). Under the *McDonnell Douglas* burden-shifting framework,* a plaintiff must first establish a prima facie case of racial discrimination. *Aragon,* 292 F.3d at 658 (citing *McDonnell Douglas Corp.,* 411 U.S. at 802). To make a prima face case, plaintiff must show that (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to an adverse employment action, and (4) similarly situated individuals outside of his protected class were treated more favorably. *Aragon,* 292 F.3d at 658 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993)). "[I]t is important to remember that '[t]he requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of

the evidence.'" *Aragon,* 292 F.3d at 659 (quoting *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994).

Second, if plaintiff succeeds in establishing a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. *Aragon,* 292 F.3d at 658 (citing *McDonnell Douglas,* 411 U.S. at 802). Third, if defendant does so, plaintiff must demonstrate that defendant's articulated reason is a pretext for unlawful discrimination by "'either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Aragon,* 292 F.3d at 658-59 (citing *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981))). A plaintiff's evidence must be both specific and substantial to overcome legitimate reasons put forth by defendant. *Aragon,* 292 F.3d at 659 (citations omitted).

Washington has, for the most part, adopted the *McDonnell Douglas* burden-shifting framework, making the test for racial discrimination under the WLAD similar to the federal test for racial discrimination under Title VII and the ADEA. *See Hill v. BCTI Income Fund–I,* 144 Wn.2d 172, 180 (2001); *Johnson v. Express Rent & Own, Inc.,* 113 Wn. App. 858, 860 n.2 (2002).

    a.  <u>Whether Plaintiff Has Made a Prima Facie Case of Racial Discrimination</u>

        *i.  Whether Plaintiff Belongs to a Protected Class*

The Parties do not dispute that Plaintiff is "African American/black" and therefore belongs to a protected class. *See* Dkt. 34, at 9.

1          *ii.   Whether Plaintiff was Qualified*

2          The Parties sharply disagree as to whether Plaintiff was qualified. *E.g.,* Dkts. 47; and 60.

3    Plaintiff contends that he was qualified based on years of satisfactory performance evaluations

4    and awards (see, e.g., Dkts. 47, at 11; and 48-5 ("I worked for a [*sic*] received good performance

5    review")), but Plaintiff was on his final disciplinary notice at the time of the shoplifting incident.

6    *See, e.g.,* Dkt. 35, at 2. Moreover, the ECAR issued to Plaintiff provides that his employment

7    was terminated with Defendant because he violated Defendant's GOV/RWD policy, which is a

8    Class A violation subject to immediate termination. *See* Dkts. 35, at 2–3; 35-4, at 7; and 35-17.

9    However, Plaintiff argues that his termination was a pretext. *See, e.g.,* Dkts. Dkt. 47, at 15; 48-7,

10   at 5 (Plaintiff alleging to the WSHRC that his assistant store manager 'falsely accused me of not

11   following company procedures so she could fire me …. I was the only Black manager in the

12   store and I was discharged for a trumped up charge by a white Female manager[.]).

13         Despite Plaintiff's disciplinary history, at least prior to the shoplifting incident, it appears

14   that he was performing his job to some degree of satisfaction and was otherwise qualified to do

15   his job. *See, e.g.,* Dkt. 48-1 (providing 2013, 2014, and 2015 performance evaluations of Plaintiff

16   rated above "not acceptable"). The Court observes that, because of Plaintiff's termination

17   following the shoplifting incident, the issue of whether Plaintiff was qualified is interconnected

18   with the second and third steps of analysis under the *McDonnell Douglas* burden-shifting

19   framework, discussed below. Here, discussion of whether Plaintiff was qualified following the

20   shoplifting incident is more appropriate for the second and third steps of analysis.

21         Therefore, Plaintiff appears to have been qualified.

22

23

24

*iii. Whether Plaintiff was Subjected to an Adverse Employment Action*

Plaintiff was subjected to an adverse employment action when his employment was terminated. *See* Dkt. 35-17.

*iv. Whether Similarly Situated Individuals Outside of Plaintiff's Protected Class Were Treated More Favorably*

Plaintiff's Supplemental Response appears to identify three alleged instances of Defendant more favorably treating individuals outside of Plaintiff's Protected Class. *See* Dkt. 47, at 11–12. First, Plaintiff argues that Mr. Eisen disciplined Plaintiff for poor performance related to cycle counts but did not do so with "Author Murphy who is Caucasian" when his counts were not turned in. Dkt. 47, at 11–12. Plaintiff provides no substantial evidence of this allegation. *See* Dkt. 47, at 11–12.

Second, Plaintiff apparently argues that Mr. Eisen was not fired when, during the shoplifting incident, he pursued the customer out of the store. *See* Dkt. 47, at 7. Plaintiff provides no substantial evidence of this allegation. *See* Dkt. 47, at 7.

Third, Plaintiff argues that he did not receive separation paperwork like other terminated employees had, including "Mr. Eisen, Ms. Orgen, and Chris Post." Dkt. 47, at 12. Plaintiff provides no substantial evidence of this allegation. *See* Dkt. 47, at 12.

Additionally, the Court observes that Plaintiff alleged in his WSHRC complaint that a "Martin Schiaffino" was treated better than Plaintiff despite having "treated shoplifters much worse"; Plaintiff does not identify Martin Schiaffino's race or age in the WSHRC complaint. Dkt. 48-6, at 5. Notably, Plaintiff's WSHRC complaint does not provide any other descriptions of similarly situated persons outside of Plaintiff's protected class being treated more favorably— including the three allegations described above in Plaintiff's Supplemental Response. *See* Dkt. 48-6, at 5. Regardless, it does not appear that Plaintiff further discusses Martin Schiaffino, and

Plaintiff provides no substantial evidence of this allegation. *See* Dkt. 47. Plaintiff has not shown that similarly situated individuals outside of his protected class were treated more favorably.

Therefore, Plaintiff has not made a prima facie case of racial discrimination.

    b.   <u>Whether Defendant Has Articulated a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff</u>

Defendant has identified Plaintiff's violation of the GOV/RWD policy during the shoplifting incident as a legitimate, nondiscriminatory reason for terminating Plaintiff. *See, e.g.,* Dkts. 34, at 28; and 35-17.

    c.   <u>Whether Defendant's Reason for Terminating Plaintiff Was a Pretext</u>

A court may grant summary judgment "when the 'record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Milligan v. Thompson,* 110 Wn. App. 628, 637 (2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000)).

Plaintiff argues that his history of satisfactory evaluations "shows that Defendant's picture is false." Dkt. 47, at 13. Plaintiff argues throughout the record that his supervisors "trumped up" the GOV/RWD violation and previous disciplinary warnings as a pretext to fire him. *See, e.g.,* Dkts. 47; at 15; and 48-6, at 5. Plaintiff's assertion is without any substantial support and creates only a very weak issue of fact as to whether Defendant legitimately terminated Plaintiff's employment because of a violation of the GOV/RWD policy. The only evidence of pretext offered by Plaintiff is Plaintiff's *ipse dixit* opinion about why he was fired. On the other hand, Plaintiff has provided substantial and extensive, and abundant and uncontroverted, support for its claim that the termination was legitimately a result of Plaintiff

1  violating the GOV/RWD policy. *See, e.g.,* Dkts. 35, at 2–3; and 36-4, at 15. Therefore, Plaintiff

2  has not shown that Defendant's reason for terminating him was a pretext.

3      Therefore, Plaintiff's race discrimination claims should be dismissed.

4  **6. AGE DISCRIMINATION CLAIMS**

5      Plaintiff's ADEA age discrimination claims should also be decided under the *McDonnell*

6  *Douglas* burden-shifting framework set forth above. *See Diaz v. Eagle Produce Ltd. P'ship,* 521

7  F.3d 1201, 1207 (9th Cir. 2008).

8      The WLAD prohibits employers from discharging "any person from employment

9  because of age . . ." or discriminating against "any person in compensation or in other terms or

10  conditions of employment because of age . . ." RCW 49.60.180(2)-(3); *see also* RCW 49.44.090

11  (providing "it shall be an unfair practice for an employer . . . because an individual is forty years

12  of age or older . . . to terminate from employment such individual" or to "discriminate against

13  such individual . . . in terms, conditions or privileges of employment").

14      Washington courts have largely adopted the federal burden-shifting scheme announced in

15  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) when evaluating employment age

16  discrimination cases under WLAD. *See Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d

17  355, 361–62 (1988); *Scrivener v. Clark College,* 176 Wn. App. 405, 411 (2013). Under the

18  *McDonnell Douglas* scheme, the employee has the initial burden of presenting a prima facie case

19  of age discrimination. *Id.* If the employee succeeds, "the burden of production shifts to the

20  employer, who must show a legitimate, nondiscriminatory reason for its conduct." *Id.* "If the

21  employer meets its burden of production, the employee must then show that the employer's

22  proffered reason was mere pretext for discrimination." *Id.*

23

24

To establish a prima facie case of age discrimination in employment, the Plaintiff must show: (1) he was within the statutorily protected age group of employees 40 years of age or older, (2) he was discharged or suffered an adverse employment action, (3) he was doing satisfactory work, and (4) he was either replaced by a substantially younger employee with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination. *See Diaz,* 521 F.3d at 1207 (9th Cir. 2008); *Becker v. Washington State University,* 165 Wn. App. 235, 252 (2011); *Martini v. Boeing Co.*, 137 Wn.2d 357, 366 (1999).

    a.  <u>Whether Plaintiff Has Made a Prima Facie Case of Age Discrimination</u>

        *i.  Whether Plaintiff Belongs to a Protected Class of Employees 40 Years of Age or Older*

It is undisputed that Plaintiff was 59 years old at the time of his termination. *See, e.g.,* Dkt. 34, at 9.

        *ii.  Whether Plaintiff was Doing Satisfactory Work*

Plaintiff appeared to be doing satisfactory work. *See* § II(5)(a)(ii), *supra.*

        *iii.  Whether Plaintiff was Subjected to an Adverse Employment Action*

Plaintiff was subjected to an adverse employment action when his employment was terminated. *See* Dkt. 35-17.

        *iv.  Whether Plaintiff was either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination*

Plaintiff's discussion in his Supplemental Response was limited to race and made almost no mention of age; Plaintiff makes no substantial arguments and points to no evidence in support of this issue. *See* Dkt. 47, at 11–13.

Therefore, Plaintiff has not made a prima facie case of age discrimination.

b. <u>Whether Defendant Has Articulated a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff</u>

Defendant has identified Plaintiff's violation of the GOV/RWD policy in the shoplifting incident as a legitimate, nondiscriminatory reason for terminating Plaintiff. *See, e.g.,* Dkts. 34, at 28; and 35-17.

c. <u>Whether Defendant's Reason Was a Pretext</u>

As discussed above, Plaintiff has not shown that Defendant's reason for terminating Plaintiff's employment was a pretext. *See* § II(5)(c), *supra*.

Therefore, Plaintiff's age discrimination claims should be dismissed.

**7. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY CLAIM**

Washington follows the employment-at-will doctrine under which an employment relationship is terminable by either the employee or employer "at any time with or without cause." *Webster v. Schauble*, 65 Wn.2d 849, 852 (1965). Washington has adopted a "narrow" exception to this rule, recognizing a tort for WDVPP "if the discharge of the employee contravenes a clear mandate of public policy." *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232 (1984).

To prevail on a WDVPP claim, a plaintiff must prove: "(1) the existence of a clear public policy (clarity element), (2) whether discouraging the conduct in which the employee engaged would jeopardize the public policy (jeopardy element), [and] (3) whether the public-policy-linked conduct caused the dismissal (causation element)." *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 277 (2015) (internal alteration and quotation omitted). Courts must also consider a fourth (4) element: "whether the employer is able to offer an overriding justification for the dismissal (absence of justification element)." *Id.* With respect to the third element, Plaintiff must not only show that his discharge may have been motivated by reasons that contravene a clear

mandate of public policy, but that the public-policy-linked conduct was a significant factor in the decision to discharge the Plaintiff. *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 725 (2018). The *McDonnell Douglas* burden-shifting framework applies to WDVPP claims, and an employer may defeat a WDVPP claim by proving that the termination was justified by an overriding consideration. *Id.*

Plaintiff makes no apparent effort to prove—or even discuss—his WDVPP claim. *See* Dkt. 47. Therefore, Plaintiff's WDVPP should be dismissed.

## 8. CONCLUSION

Defendant's Motion for Summary Judgment should be granted. Plaintiff has not shown that a genuine issue of material fact exists as to his race and age discrimination claims and his WDVPP claim against Defendant. There being no other claims against Defendant, this case should be dismissed.

## III. <u>ORDER</u>

**THEREFORE**, it is **HEREBY ORDERED** that:

- Defendant's Motion for Summary Judgment (Dkt. 34) is GRANTED; and

- This case is DISMISSED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 25th day of March, 2020.

ROBERT J. BRYAN
United States District Judge